# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT, | |
| *Plaintiff,* | |
| v. | Civil Action No. 19-449 (RDM) |
| CENTRAL INTELLIGENCE AGENCY, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this Freedom of Information Act case, 5 U.S.C. § 552 ("FOIA"), the Plaintiff, a non-profit public-interest law firm, requested that the Central Intelligence Agency ("CIA")—as well as the Departments of Commerce, Treasury, Defense, and Energy—produce records discussing the provision of certain nuclear technologies to countries in the Middle East.  Dkt. 1 at 28–30 (Compl. ¶¶ 85–95).  The CIA demurred:  It would not say whether it had the records or not.  Doing so, the agency claimed, would threaten national security.

The propriety of that response is at issue here, contested in cross-motions for summary judgment filed by each party.  Dkt. 24; Dkt. 26.  Plaintiff, the Government Accountability Project ("GAP"), wants the CIA to acknowledge and to disclose the records that it has.  The CIA, meanwhile, stands by the non-response response it provided.  For the reasons that follow, the Court will **GRANT** in part and **DENY** in part the CIA's motion, and will **DENY** GAP's cross-motion.

# I. BACKGROUND

"In extending abroad, under proper security safeguards, the evolving technology of atomic energy for peaceful purposes, we shall tighten the bonds that tie our friends abroad to us, we shall assure material resources that we need, and we shall maintain world leadership in atomic energy—leadership which today is such a large element of our national prestige." S. Rep. No. 83-1699, at 101 (1954). These were the lofty goals of the Atomic Energy Act of 1954, enacted just shy of nine years after World War II concluded. To meet its ends, the Act governs how the United States may cooperate with other countries on the subject of nuclear material. The Act requires, for example, that nuclear cooperation agreements contain certain terms, like a guarantee by the cooperating party that it will protect any nuclear material the United States provides. 42 U.S.C. § 2153(a)(1). The Act also establishes certain processes that the executive branch must follow before cooperation is permitted—mandating, for instance, the submission of proposed cooperation agreements to Congress for review and approval. *Id.* § 2153(c). The rationale for these rules was simple: "Almost any cooperation with any foreign country can be said to involve some risk to the common defense and security of the United States. The provisions are designed to permit cooperation where, upon weighing those risks (of proliferation) in the light of the safeguards provided, there is found to be no unreasonable risk to the common defense and security." S. Rep. No. 83-1699, at 22.

At issue here, according to GAP, is the fidelity of certain officials in the Trump Administration to the Atomic Energy Act's safeguards. In April 2015, Retired Lieutenant General Michael Flynn ("Flynn"), while acting as an advisor to a private firm, ACU Strategic Partners ("ACU"), allegedly began developing "the Middle East Marshall Plan"—an ambitious effort to "work with Russia to build nuclear reactors in the Middle East." Dkt. 1 at 5 (Compl.

2

¶ 18); *see also* Dkt. 26-2 at 2 (Pl.'s SUMF ¶ 4).[1]  The following year Flynn became an advisor to

another private firm, International Peace Power & Prosperity ("IP3"), which, GAP alleges, was

itself promoting a plan to build nuclear reactors in the Middle East.  Dkt. 1 at 7 (Compl. ¶ 25).

In January 2017, Flynn joined the Trump administration as National Security Advisor.  Dkt. 26-2

at 2 (Pl.'s SUMF ¶ 4).  Thereafter, "Flynn 'talked favorably' about the nuclear proposal with

Thomas Barrack, Jr., a businessman and long-time Trump confidante who was heading up the

Trump Inauguration Committee," *id.* at 3 (Pl.'s SUMF ¶ 5), and who "also was considering

buying a stake in Westinghouse Electric Company, a producer of nuclear reactors," *id.* (Pl.'s

SUMF ¶ 6).

Shortly after Flynn joined the National Security Council ("NSC"), "IP3's co-founder

Robert McFarlane emailed documents to Flynn, which included an outline of the Middle East

nuclear plan and 'a draft memo for the president to sign authorizing the project' and instructing

cabinet secretaries to implement it."  *Id.* (Pl.'s SUMF ¶ 8) (quoting Dkt. 1 at 13 (Compl. ¶ 42)).

NSC staff raised concerns with Derek Harvey, a retired Army colonel that Flynn had installed on

the NSC, "that any plan to transfer nuclear technology must comply with Section 123 of the

---

[1]  Under Local Civil Rule 7(h)(1), any opposition to a motion for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  The Rule further explains that "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  *Id.*  Here, the CIA's opposition to GAP's motion for summary judgment was *not* accompanied by any counterstatement of material facts.  *See* Dkt. 46.  Accordingly, for purposes of the reciting the relevant background, the Court will assume that the facts identified by GAP in its statement of material facts, Dkt. 26-2, are admitted.  That does not mean, however, that the Court lends its imprimatur to, or endorses as true, GAP's account of the pertinent events.

Atomic Energy Act, which requires consultation with experts at the NSC, Department of State, Department of Defense, and Department of Energy." *Id.* at 4 (Pl.'s SUMF ¶ 9).[2]

Later that year, after the murder of journalist Jamal Khashoggi, "it was reported that Energy Secretary Rick Perry was 'pressing ahead with efforts to strike a deal that would allow U.S. companies such as Westinghouse Electric Co. [to] build . . . nuclear reactors in Saudi Arabia,'" *id.* (Pl.'s SUMF ¶¶ 10–11) (quoting Dkt. 1 at 20 (Compl. ¶ 65)), despite opposition from bipartisan groups in Congress, *id.* (Pl.'s SUMF ¶ 10). Then, in February 2019, at the behest of IP3's co-founder, Jack Keane, "U.S. nuclear energy developers, including Westinghouse, met with President Trump to seek assistance in winning contracts to build power plants in the Middle East and other countries." *Id.* (Pl.'s SUMF ¶ 12). According to GAP, the "[d]iscussions included efforts to secure Section 123 Agreements with Saudi Arabia and Jordan that would allow U.S. nuclear power companies to share their technology with those countries and others in the Middle East." *Id.* (Pl.'s SUMF ¶ 13).

That same month, "the House Committee on Oversight and Reform released its first interim staff report about 'efforts inside the White House to rush the transfer of highly

---

[2] What GAP refers to as "Section 123 of the Atomic Energy Act" is codified at 42 U.S.C. § 2153(a), which provides in pertinent part:

> [A]ny proposed agreement for cooperation shall be negotiated by the Secretary of State, with the technical assistance and concurrence of the Secretary of Energy; and after consultation with the Commission shall be submitted to the President jointly by the Secretary of State and the Secretary of Energy accompanied by the views and recommendations of the Secretary of State, the Secretary of Energy, and the Nuclear Regulatory Commission. The Secretary of State shall also provide to the President an unclassified Nuclear Proliferation Assessment Statement . . . [which] shall be accompanied by a classified annex, prepared in consultation with the Director of Central Intelligence, summarizing relevant classified information. In [certain cases,] . . . any proposed agreement for cooperation shall be submitted to the President by the Secretary of Energy or, in [other cases,] . . . by the Department [or Secretary ] of Defense . . . .

sensitive U.S. nuclear technology to Saudi Arabia in potential violation of the Atomic Energy Act and without review by Congress as required by law—efforts that may be ongoing to this day.'" *Id.* at 5 (Pl.'s SUMF ¶ 14) (quoting First Interim Staff Report, *Whistleblowers Raise Grave Concerns with Trump Administration's Efforts to Transfer Sensitive Nuclear Technology to Saudi Arabia*, at 2, Comm. on Oversight and Reform U.S. House of Representatives, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Trump%20Saudi%20Nuclear%20Report%20-%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.pdf). "The report states that multiple whistleblowers came forward to express 'significant concerns about the potential procedural and legal violations connected with rushing through a plan to transfer nuclear technology to Saudi Arabia.'" *Id.* (Pl.'s SUMF ¶ 15) (quoting same).

Several months later, "[i]n July 2019, the House Oversight Committee, based on a review of more than 60,000 pages of documents obtained since February 2019, released a second interim report, which concluded that 'contacts between private and commercial interests and high-level Trump Administration officials were more frequent, wide-ranging, and influential than previously known—and continue to the present day.'" *Id.* (Pl.'s SUMF ¶ 16) (quoting Second Interim Staff Report, *Corporate and Foreign Interests Behind White House Push to Transfer U.S. Nuclear Technology to Saudi Arabia*, Comm. on Oversight and Reform U.S. House of Representatives, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Trump%20Saudi%20Nuclear%20Report%20July%202019.pdf). The report included three references to then-CIA Director Mike Pompeo and recounted two correspondences from IP3 to certain members of the intelligence community. *Id.* at 5–6 (Pl.'s SUMF ¶ 18). Although the references to Pompeo are opaque, they suggest (at least) that IP3 attempted "to promote [its] plan with high-level stakeholders[,] including . . . Pompeo" among others. *Id.*

On August 29, 2018, GAP submitted a FOIA request to the CIA seeking records "from January 20, 2017 to the present regarding: (1) civil nuclear cooperation with Middle Eastern countries, most notably Saudi Arabia; (2) the Middle East Marshall Plan; (3) negotiation of a U.S.-Saudi '123' Civil Nuclear Cooperation Agreement; (4) the IP3 Corporation and its proposal for nuclear and cyber cooperation with various Middle Eastern countries; and (5) Westinghouse, including its March 2017 bankruptcy and the subsequent policy response of the U.S. Government." *Id.* at 6 (Pl.'s SUMF ¶ 19); *see also* Dkt. 1 at 28 (Compl. ¶ 85); Dkt. 24-2 at 1 (Def.'s SUMF ¶ 1). "To help focus the CIA's search for responsive records, GAP provided [the CIA] four categories of additional information," Dkt. 26-2 at 6 (Pl.'s SUMF ¶ 20); "identified 18 White House staff likely to have been referenced in the requested documents and communications," *id.* at 7 (Pl.'s SUMF ¶ 21); "identified [six] individuals at the IP3 Corporation for which the CIA would have correspondence," *id.* (Pl.'s SUMF ¶ 22); and "identified [groups of] individuals at the CIA . . . most likely to have responsive information in their emails, archived documents, or other stored files," *id.* (Pl.'s SUMF ¶ 23); *see also* Dkt. 24-2 at 1 (Def.'s SUMF ¶ 1).

On December 4, 2018, "the CIA requested further clarity from [GAP] with respect to the first category of information [] requested in order to allow the CIA to conduct a reasonable search." Dkt. 24-2 at 2 (Def.'s SUMF ¶ 3); *see also* Dkt. 26-2 at 8 (Pl.'s SUMF ¶ 24). "GAP responded by letter dated January 8, 2019, clarifying that its request for records regarding civil nuclear cooperation with Middle Eastern countries, most notably Saudi Arabia, should be interpreted to mean records regarding cooperation between the United States and one or more of the following: Egypt, Jordan, and Saudi Arabia. GAP further clarified that the term 'civil nuclear cooperation' should be interpreted to mean any form of assistance regarding the

acquisition of nuclear material, equipment, or technology by foreign countries; funds or financing to acquire nuclear material, equipment, or technology; and efforts by U.S. entities and persons to promote the acquisition of civilian nuclear reactors and related services by foreign countries." Dkt. 26-2 at 8 (Pl.'s SUMF ¶ 25); *see also* Dkt. 24-2 at 2 (Def.'s SUMF ¶ 4).

Six weeks later, and "[b]efore the CIA provided a substantive response to [GAP's] FOIA request," Dkt. 24-2 at 2 (Def.'s SUMF ¶ 5), GAP brought this FOIA action. While the litigation was ongoing, "the CIA completed its review of [GAP's] FOIA request and determined that, in accordance with section 3.6(a) of Executive Order 13,526, it could neither confirm nor deny the existence or nonexistence of records responsive to [GAP's] FOIA request." Dkt. 24-2 at 2–3 (Def.'s SUMF ¶ 5).[3] That was because "confirming or denying the existence or nonexistence of the requested records would reveal classified information that is protected from disclosure by executive order and federal statute." *Id.* at 3 (Def.'s SUMF ¶ 6). In particular, the CIA averred, "[c]onfirming or denying whether the CIA has information responsive to the requests at issue would cause harm to national security." *Id.*

The instant cross-motions for summary judgment followed. Dkt. 24; Dkt. 26; Dkt. 46; Dkt. 48. Meanwhile, the Departments of Commerce, Treasury, Defense, and Energy have embarked on the task of processing and releasing non-exempt, responsive records. That process is underway but is far from complete at this time.

---

[3] Section 3.6(a) of Executive Order 13526 provides: "[I]n response to a request for information under the Freedom of Information Act, the Presidential Records Act, the Privacy Act of 1974, or the mandatory review provisions of this order: (a) [a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Executive Order No. 13526 ("Exec. Order 13526"), 75 Fed. Reg. 707 (Dec. 29, 2009).

## II. LEGAL STANDARD

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Bartko v. Dep't of Just.*, 898 F.3d 51, 61 (D.C. Cir. 2018) (internal quotation marks omitted). The Act is premised on the notion that "an informed citizenry [is] vital to the functioning of a democratic society . . . [and] needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA thus "protects the basic right of the public 'to be informed about what their government is up to,'" *Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020) (quoting *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 150 (D.C. Cir. 2016)), and embraces "'a general philosophy of full agency disclosure,'" *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) (citation omitted).

"FOIA does not pursue transparency at all costs," however. *Hall*, 956 F.3d at 624. Instead, Congress recognized that "legitimate governmental and private interests could be harmed by release of certain types of information." *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101, 102 (D.C. Cir. 2017). Congress thus exempted nine categories of records from FOIA's disclosure requirements. 5 U.S.C. § 552(b)(1)–(9). In light of FOIA's preference for disclosure, however, these exemptions are to be "narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982).

Under limited circumstances, an agency "may refuse to confirm or deny the existence of records" in response to a FOIA request. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)). "Such an agency response is known as a *Glomar* response," *id.*, and presents "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request," *Roth v. U.S.*

*Dep't of Just.*, 642 F.3d 1161, 1178 (D.C. Cir. 2011).[4]  A *Glomar* response, the D.C. Circuit has

explained, is proper if "the fact of the existence or nonexistence of agency records falls within a

FOIA exemption,"—or, in other words, if the very act of answering "the FOIA inquiry would

cause harm cognizable under an FOIA exception," *Wolf*, 473 F.3d at 374 (quoting *Gardels*, 689

F.2d at 1103).  For that reason, "[i]n determining whether the existence of agency records *vel*

*non* fits a FOIA exemption, courts apply the general exemption review standards established in

non-*Glomar* cases." *Id.*; *see also Gardels*, 689 F.2d at 1103–07.  Thus, like an agency that

refuses to produce records, an agency that refuses to acknowledge them bears the burden of

justifying its decision.  5 U.S.C. § 552(a)(4)(B); *Fed. Open Mkt. Comm. of the Fed. Rsrv. Sys. v.*

*Merrill*, 443 U.S. 340, 352 (1979); *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

To meet that burden, an agency must submit "relatively detailed and non-conclusory"

affidavits or declarations explaining why its *Glomar* response was merited.  *SafeCard Servs.,*

*Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks and citation omitted); *see*

*also Phillippi*, 546 F.2d at 1013.  The Court is obligated to review an agency's affidavits or

declarations *de novo*, 5 U.S.C. § 552(a)(4)(B), but, as the D.C. Circuit has cautioned, "*de novo*

review in FOIA cases is not everywhere alike," *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R.*

*Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).  That is especially so in the face "of national

security concerns," where "courts must accord substantial weight to an agency's affidavit

---

[4]  "'The term *Glomar* comes from [the D.C. Circuit's] opinion in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), which involved a FOIA request for information regarding' a ship named the 'Hughes Glomar Explorer.'" *Klayman v. CIA*, 170 F. Supp. 3d 114, 117 n.1 (D.D.C. 2016) (quoting *Moore v. CIA*, 666 F.3d 1330, 1331 n.1 (D.C. Cir. 2011)); *see also Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 n.4 (D.C. Cir. 2012) ("The *Glomar* response takes its name from the *Hughes Glomar Explorer*, a ship built (we now know) to recover a sunken Soviet submarine[] but disguised as a private vessel for mining manganese nodules from the ocean floor." (internal quotation marks and citation omitted)).

concerning the details of the classified status of the disputed record." *Wolf*, 473 F.3d at 374 (citations and internal quotation marks omitted); *see also Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Ray v. Turner,* 587 F.2d 1187, 1194 (D.C. Cir. 1978) ("[T]he executive ha[s] unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record." (internal quotation marks omitted)); *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[B]oth the Supreme Court and this Court have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security.").

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g., Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A fact is "material" if it is capable of affecting the outcome of a dispute, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable factfinder—here, the Court—could find in favor of the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007). In a FOIA case, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (quoting *Mil. Audit Project*, 656 F.2d at 738). In the *Glomar* context, however, a reviewing court must "take into account . . . that any affidavit or other agency statement of threatened harm

to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980).

## III. ANALYSIS

The CIA argues that its *Glomar* response was proper because acknowledgment that the records do or do not exist would cause cognizable harm under FOIA Exemptions 1 and 3. Dkt. 24-1 at 1. In support of that argument, the CIA has submitted the declaration of Antoinette B. Shiner, the Information Review Officer ("IRO") for the Litigation Information Review Office at the CIA. Dkt. 24-3 at 1 (Shiner Decl.). Before addressing the sufficiency of Shiner's declaration, a brief overview of the relevant Exemptions is in order.

### A.  Asserted FOIA Exemptions

1.  *Exemption 1*

FOIA Exemption 1 permits an agency to withhold "matters that are . . . specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [that] are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1); *see also Salisbury v. United States*, 690 F.2d 966, 971–72 (D.C. Cir. 1982). Here, the applicable order is Executive Order 13526, which authorizes the classification of information pertaining to any of the following topics, so long as "unauthorized disclosure" of such information "could reasonably be expected to cause identifiable or describable damage to the national security":

  (a)  military plans, weapons systems, or operations;

  (b)  foreign government information;

  (c)  intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(h) the development, production, or use of weapons of mass destruction.

Exec. Order 13526 § 1.4; *see also id.* § 1.2; Dkt. 24-3 at 10 (Shiner Decl. ¶ 19).[5]

2. *Exemption 3*

FOIA Exemption 3 permits an agency to withhold information "specifically exempted from disclosure by statute," if such statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *DiBacco v.*

---

[5] Executive Order 13526 also requires that "the original classification authority [has] determine[d] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage." Exec. Order 13526 § 1.1(4). On that score, neither party contests that Shiner qualifies as an original classification authority because she is the current IRO in the Litigation Information Review Office at the CIA. *Cf. Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 276–77 (D.D.C. 2011) (IRO of the National Clandestine Service of the CIA is proper classification authority to invoke exemptions supporting *Glomar* response).

*U.S. Army*, 795 F.3d 178, 197 (D.C. Cir. 2015) (quoting *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007)).

Here, the Department invokes the National Security Act of 1947, § 102A(i), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024(i)(1) (collectively, the "National Security Act"). *See* Dkt. 24-3 at 16–17 (Shiner Decl. ¶¶ 28–29). The National Security Act requires the Director of National Intelligence ("DNI") to protect "intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and authorizes the DNI to promulgate guidelines for the intelligence community regarding "[a]ccess to and dissemination of intelligence, both in final form and in the form when initially gathered," *id.* § 3024(i)(2)(B). Consistent with his duties and powers, the DNI has promulgated Intelligence Community Directive 700, which directs elements of the intelligence community to "[p]rotect[ ] national intelligence and intelligence sources, methods, and activities from unauthorized disclosure[.]" Intelligence Community Directive (ICD)700, at 3 (June 7, 2012), available at https://www.dni.gov/files/documents/ICD/ICD_700.pdf.

That directive binds the CIA and, according to the agency, further justifies its *Glomar* response here. Dkt. 24-3 at 16–17 (Shiner Decl. ¶¶ 28–29); *see also DiBacco*, 795 F.3d at 197–200 (explaining that, under the National Security Act, the DNI has "authority to assign responsibility to intelligence agency heads to protect intelligence sources and methods"); Exec. Order 12333, 46 Fed. Reg. 59,941 (Dec. 4, 1981), amended by Exec. Order 13470, § 1.6(d), 73 Fed. Reg. 45,325, 45,332 (July 30, 2008) ("The heads of elements of the Intelligence Community shall . . . Protect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI]."). For its part, GAP does not dispute that the National Security Act falls within Exemption 3—nor could it. The D.C. Circuit has

repeatedly held that the National Security Act "is a valid Exemption 3 statute." *DiBacco*, 795 F.3d at 183; *see also Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993). Nor does GAP dispute that the National Security Act gives the DNI, and by delegation other elements of the intelligence community, *see DiBacco*, 795 F.3d at 197–198, "wide-ranging authority to protect intelligence sources and methods from unauthorized disclosure," *CIA v. Sims*, 471 U.S. 159, 177 (1985) (internal quotation marks omitted); *see also Whitaker v. CIA*, 64 F. Supp. 3d 55, 63–64 (D.D.C. 2014) ('[C]ourts are required to give 'great deference' to the . . . assertion that a particular disclosure could reveal intelligence sources or methods.") (quoting *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007)). Instead, GAP disputes only whether the CIA's *Glomar* response in this case is consistent with the National Security Act's coverage.

## B.     The *Glomar* Response

In assessing the propriety of the CIA's *Glomar* response, the Court begins with the agency's first claimed exemption—Exemption 1. To justify its invocation of that exemption, the CIA must explain (1) how the subject matter of GAP's FOIA request pertains to a type of information enumerated in Executive Order 13526, and (2) whether "unauthorized disclosure" of information pertaining to that topic "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order 13526 § 1.4. "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wolf*, 473 F.3d at 374–75 (citations and internal quotation marks omitted). As explained below, the CIA has, with one exception, carried this burden.

### 1.     *Executive Order 13526*

To start, the subject matter of GAP's request falls within the coverage of Executive Order 13526. GAP's FOIA request, recall, sought records related to the following five topics: (1) civil

nuclear cooperation with Middle Eastern countries, most notably Saudi Arabia; (2) the Middle

East Marshall Plan; (3) negotiation of a U.S.-Saudi '123' Civil Nuclear Cooperation Agreement;

(4) the IP3 Corporation and its proposal for nuclear and cyber cooperation with various Middle

Eastern countries; and (5) Westinghouse, including its March 2017 bankruptcy and the

subsequent policy response of the U.S. Government."  Dkt. 26-2 at 6 (Pl.'s SUMF ¶ 19); *see also*

Dkt. 1 at 28 (Compl. ¶ 85); Dkt. 24-2 at 1 (Def.'s SUMF ¶ 1).  Each of these topics, as GAP

itself admits, pertains directly to the interest of the United States in the provision of nuclear

technologies to countries in the Middle East.  GAP explains its requests as follows:

> Request 1:  "[T]he term 'civil nuclear cooperation' should be interpreted to
> mean any form of assistance regarding the acquisition of nuclear material,
> equipment, or technology by foreign countries; funds or financing to acquire
> nuclear material, equipment, or technology; and efforts by U.S. entities and
> persons to promote the acquisition of civilian nuclear reactors and related
> services by foreign countries."  Dkt. 26-2 at 8 (Pl.'s SUMF ¶ 25); *see also*
> Dkt. 24-2 at 2 (Def.'s SUMF ¶ 4).[6]

> Request 2:  The Middle East Marshall Plan relates to an alleged effort
> between "private entities and individuals, *acting in concert with the Trump
> administration*, . . . to bypass protocols intended to protect United States
> interests in order to provide Saudi Arabia with nuclear technology."  Dkt.
> 26-1 at 4 (emphasis added).

> Request 3:  The U.S.-Saudi 123 Civil Nuclear Cooperation Agreement
> relates to an alleged effort by the United States government to enter into an
> agreement with Saudi Arabia and Jordan to "allow U.S. nuclear power
> companies to share their technology with those countries and others in the
> Middle East."  *Id.* at 10.

> Request 4:  GAP's fourth request asks for materials related to IP3's
> "proposal for nuclear and cyber cooperation with various Middle Eastern
> countries," Dkt. 26-2 at 6 (Pl.'s SUMF ¶ 19)—a proposal which, GAP
> claims, was discussed by members of the NSC and related to efforts made to
> cajole former-President Trump to "work[]with Russia on a nuclear reactor
> project," Dkt. 26-1 at 8.

---

[6]  GAP later narrowed this request to seek records related to "cooperation between the United
States and . . . Egypt, Jordan, and Saudi Arabia."  Dkt. 26-2 at 8 (Pl.'s SUMF ¶ 25).

Request 5: The company Westinghouse was at the heart of then-Energy Secretary Rick Perry's "efforts to strike a deal that would allow [certain U.S. companies to] . . . build nuclear reactors in Saudi Arabia[.]" *Id.* at 10 (internal quotation marks, alteration, and citation omitted).

Section 1.4 of Executive Order 13526, however, prevents the unauthorized disclosure of precisely the types of information that GAP requests. That portion of the Executive Order twice affirms that classification of information pertaining to foreign relations is proper; *see* Exec. Order 13526 § 1.4(b) ("foreign government information"); (d) ("foreign relations or foreign activities of the United States"), and it curtails, in three separate subsections, disclosure of information related to the U.S. government's interests in nuclear material, *see id.* § 1.4(e) ("scientific, technological, or economic matters relating to the national security"); (f) ("United States Government programs for safeguarding nuclear materials or facilities"); (h) ("the development, production, or use of weapons of mass destruction"). It is hard to square these classification categories with GAP's FOIA request, which on its face seeks records related to efforts of the Trump administration to provide, or to aid and assist in the provision of, nuclear technology to foreign countries. The disclosure of information of this type—or the absence of any such information—is precisely what subsections (b), (d), (e), (f), and (h) of Executive Order 13526 safeguards against.

2. *National Security*

The remaining question, then, is whether "unauthorized disclosure" of the information sought—or, more to the point, unauthorized disclosure of whether the CIA has the records that GAP seeks—"could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order 13526 § 1.4. In making that assessment, the Court is mindful that "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible," *Wolf*, 473 F.3d at 374–75 (citations and internal quotation marks omitted), and that it

is not the Court's role to second-guess the reasonable judgment of executive branch officials when national security interests are plausibly at stake, *see Mil. Audit Project*, 656 F.2d at 738; *Turner*, 587 F.2d at 1194; *Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927; *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999); *Ullah v. CIA*, 435 F. Supp. 3d 177, 184 (D.D.C. 2020) ("[T]his Circuit's FOIA caselaw cautions strongly against second-guessing the Government's discretionary decisions in matters of national security.").   In view of the deference that the executive is owed in this context, the Court concludes that the CIA has adequately shown that "unauthorized disclosure" *vel non* of the type of information sought "could reasonably be expected to cause identifiable or describable damage to the national security."  Exec. Order 13526 § 1.4.

The Shiner declaration explains that a non-*Glomar* response in this case would give rise to a cognizable threat to national security in three ways.  First, and most directly, it would provide U.S. adversaries "insight into the scope and nature of CIA's intelligence activities and interests."  Dkt. 24-3 at 13 (Shiner Decl. ¶ 23).  Shiner avers:

> It would be alerting and possibly alarming for foreign countries to learn that CIA was somehow involved or interested in specific . . . policy proposals, signaling to both the diplomats and the world that there was something about the [proposals] that warranted CIA involvement.  Here, for example, acknowledging the existence of records responsive to Plaintiff's FOIA request would tend to reveal that CIA may have an intelligence interest in or information about . . . [the requested subject matter].  On the other hand, if it were disclosed that CIA was not . . . interested in these topics, then it would signal to foreign governments and intelligence services that these were not of interest to CIA or that intelligence had not been gathered on these topics.  This disclosure would give other countries insight into the scope and nature of CIA's intelligence activities and interests . . . .

*Id.* at 12–13 (Shiner Decl. ¶ 23).  Second, Shiner explains that acknowledgment *vel non* of the requested records would impinge on the CIA's ability "to operate as an effective clandestine intelligence agency."  *Id.* at 13 (Shiner Decl. ¶ 24).  She attests:

> For the CIA to operate as an effective clandestine intelligence agency, it must be able to conceal its own involvement, or noninvolvement, in meetings or discussions with, among others, U.S. Government officials or foreign governments related to specific policy proposals. . . . Forcing the CIA to disclose whether or not it has documents responsive to Plaintiff's FOIA request would reveal whether or not the CIA may have collected pertinent intelligence that could have been provided to U.S. Government officials.

*Id.* at 14–15 (Shiner Decl. ¶¶ 24–25). Finally, Shiner explains that, in light of the CIA's clandestine nature and given that a non-*Glomar* response would elucidate the agency's intelligence interests, public revelation of the information GAP seeks would enable foreign organizations to counter the CIA's efforts and to threaten the United States. That is:

> Although it is widely known that the CIA is responsible for performing activities in support of foreign intelligence collection and analysis for the United States, the CIA generally does not confirm or deny the existence or nonexistence of, or disclose the target of, specific intelligence activities. Foreign intelligence services, terrorist organizations, and other hostile groups seek to obtain and use this type of information to defeat, undermine, and avoid CIA activities and to attack the United States and its interests.

*Id.* at 11–12 (Shiner Decl. ¶ 22).

Based on the Shiner declaration, it is not particularly challenging to see how disclosure of whether the CIA possesses records responsive to GAP's FOIA request "could reasonably be expected to cause identifiable or describable damage to the national security."[7] Exec. Order

---

[7] FOIA Exemption 1 permits an agency to withhold "matters that are . . . specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [that] are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). It is not clear whether the CIA's *Glomar* response complies, in all respects, with Executive Order 13526. For instance, the Executive Order requires that "[a]t the time of original classification, the original classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information." Exec. Order 13526 § 1.5. No such declassification timeline was provided here. Nevertheless, GAP has not raised this argument and it is, accordingly, forfeited. The Court notes, moreover, that "[s]o long as procedural violations [of Executive Order 13526] do not undermine the agency's decision to classify—as when, for example, a procedural violation suggests that, contrary to the [Executive Order], classification was undertaken in order to conceal

13526 § 1.4. The United States depends on its intelligence agencies to carry out their missions, Dkt. 24-3 at 6–7 (Shiner Decl. ¶ 13), and the CIA depends on secrecy to do so, *id.* at 11 (Shiner Decl. ¶ 22) ("Clandestine intelligence activities lie at the heart of the CIA's mission."). Shiner attests that compelling a non-*Glomar* response here would imperil the CIA's ability to carry out its mission, Dkt. 24-3 at 6 (Shiner Decl. ¶ 12) ("[T]he requests at issue in this case seek precisely those types of information regarding the CIA's role or interest in sensitive foreign activities."); *see also ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011) (finding *Glomar* response proper where disclosure "would degrade the CIA's ability to carry out its mission"); *cf. Morley*, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."). And it is certainly "logical" or "plausible" to view the risks that Shiner identifies as presenting a legitimate threat to national security. *Wolf*, 473 F.3d at 375.

### 3. *Counterarguments*

GAP lodges several counterarguments in response to the CIA's reliance on Exemption 1. *See* Dkt. 26-1. With one, limited exception, none persuade.

First, GAP contends that "[f]ar from seeking 'intelligence information,' [it] seeks information about the extent to which private interests corrupted the process the United States is statutorily required to use in reaching civil nuclear agreements." *Id.* at 16. But even accepting that construction of GAP's request, whether the CIA retains records about "civil nuclear

---

a violation of law—the Court will not order documents to be released on that ground." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 857 F. Supp. 2d 44, 59 (D.D.C. 2012), *aff'd* 715 F.3d 937 (D.C. Cir. 2013); *see also Lesar v. U.S. Dep't of Just.*, 636 F.2d 472, 483 (D.C. Cir. 1980). And indeed, one Judge in this district has concluded "that the CIA is not required to establish a declassification timeline in order to properly classify a *Glomar* fact under Executive Order 13,526." *Mobley v. CIA*, 924 F. Supp. 2d 24, 50 (D.D.C. 2013) (internal quotation marks, alteration, and citation omitted).

agreements" between the United States and the three countries in the Middle East that GAP identified—Egypt, Jordan, and Saudi Arabia, Dkt. 26-2 at 8 (Pl.'s SUMF ¶ 25)—would *itself* reveal the presence or absence of a particular CIA intelligence interest that is protected from disclosure by Executive Order 13526. The question is not, then, whether GAP *seeks* intelligence information—it is whether a non-*Glomar* response would reveal it. And, for the reasons explained above, it would.

Second, GAP argues that the CIA's assertions of national-security risk "are overblown at best." Dkt. 26-1 at 17. The Court, once again, is unpersuaded. The Shiner declaration draws a "logical" and "plausible" connection between the revelation that a non-*Glomar* response in this case would yield and the attendant risk to national security that it would create. *Wolf*, 473 F.3d at 375. Once that threshold is reached, as it is here, the Court must respect the executive's expertise and discretion in matters of national security. *See Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977) ("Few judges have the skill or experience to weigh the repercussions of disclosure of intelligence information."); *see also Mil. Audit Project*, 656 F.2d at 738; *Turner*, 587 F.2d at 1194; *Ullah*, 435 F. Supp. 3d at 184.

GAP's next argument is more substantial: it contends that the CIA's *Glomar* response is overly broad and insufficiently detailed under the D.C. Circuit's decision in *ACLU v. CIA*, 710 F.3d 422, 425 (D.C. Cir. 2013). Dkt. 26-1 at 18–19. In that case, plaintiffs filed a FOIA request with the CIA seeking records pertaining to the use of drones to carry out targeted killings. *ACLU*, 710 F.3d at 425. In response, the CIA invoked *Glomar*, arguing "that it was necessary to keep secret whether the CIA itself was involved in, or interested in, such strikes." *Id.* at 428. Up to this point, the D.C. agreed, noting that "[t]here is no doubt [that] . . . disclosure would reveal whether the Agency 'at least has an intelligence interest in drone strikes.'" *Id.* at 428–29. But,

the D.C. Circuit was unpersuaded that it was either "logical or plausible[] for the CIA to contend that" revealing whether it had "an intelligence interest in such strikes" would jeopardize national security, "[g]iven the extent of the official statements on the subject." *Id.* at 429. In other words, the D.C. Circuit recognized that revelation of the CIA's intelligence interests was a basis upon which a *Glomar* response could be invoked, but only if that intelligence interest was not something "already officially acknowledged." *Id.*

GAP misreads *ACLU* to stand for a different proposition altogether—namely, that the CIA may not invoke *Glomar* when the acknowledgement *vel non* of records would reveal the "intelligence role" of another agency instead of the CIA's. In support of that reading, GAP points to the following passage in *ACLU:*

> [T]he CIA did not justify its *Glomar* response by contending that it was necessary to prevent disclosing whether or not the United States engages in drone strikes. Rather, as we have noted, the response was justified on the ground that it was necessary to keep secret whether the CIA itself was involved in, or interested in, such strikes. Although the Agency's brief repeatedly emphasizes the first prong of this justification—protecting whether the CIA operates drones—that is not the issue before us on this appeal. The plaintiffs requested the release of ten categories of documents pertaining to drone strikes, each of which sought documents about drones, but none of which was limited to drones operated by the CIA. . . . Nor was the CIA's *Glomar* response limited to documents about drones operated by the Agency. Rather, the CIA asserted and the district court upheld a sweeping *Glomar* response that ended the plaintiffs' lawsuit by permitting the Agency to refuse to say whether it had any documents at all about drone strikes.
>
> The CIA has proffered no reason to believe that disclosing whether it has any documents at all about drone strikes will reveal whether the Agency itself—as opposed to some other U.S. entity such as the Defense Department—operates drones.

*Id.* at 428. From this passage, GAP draws the following syllogism: the CIA in *ACLU* justified its *Glomar* response based on agency-specific considerations; the CIA did the same thing here; in *ACLU*, the FOIA request at issue sought records about the United States government writ large,

not about the CIA specifically; GAP's FOIA request does the same thing here; in *ACLU*, the CIA had its *Glomar* response rejected; and thus the CIA's invocation of *Glomar* should fail here as well.

The difficulty with this approach is that it misunderstands what *ACLU* was actually about. The decision did not concern whether a *Glomar* response by one agency was improper merely because it might shield records that disclosed the activities of other agencies. Instead, the D.C. Circuit assumed that a *Glomar* response could be proper on that basis and then addressed "[t]he question . . . whether it is 'logical or plausible[]' for the CIA to contend that it would reveal something not already officially acknowledged to say that the Agency 'at least has an intelligence interest' in such strikes." *Id.* at 429.

Properly understood, *ACLU*'s only aid to GAP can come in the form of the official acknowledgement doctrine. But GAP makes no effort to explain how that doctrine applies here. And to the extent GAP's isolated reliance on the House Oversight Reports can be construed as making such a claim, *see, e.g.*, Dkt. 26-1 at 10–12, 17–18, that claim would fail. "To find official acknowledgment, . . . three prerequisites must be met: 'the information requested must be as specific as the information previously released,' 'match the information previously disclosed,' and 'already have been made public through an official and documented disclosure.'" *Leopold v. CIA*, 987 F.3d 163, 170 (D.C. Cir. 2021) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 76 (D.C. Cir. 1990)). "In the *Glomar* context, then, if the prior disclosure establishes the existence (or not) of records responsive to the [information] request, the prior disclosure necessarily matches both the information at issue . . . and the specific request for that information." *Id.* (quoting *Wolf*, 473 F.3d at 379). "This test is 'strict,'" *id.* (quoting *Moore*, 666 F.3d at 1333), and "[t]he initial

burden rests with the requester, who must 'point[ ] to specific information in the public domain that appears to duplicate that being withheld," *id.* (quoting *ACLU*, 710 F.3d at 427).

GAP points to only three statements contained in the House Oversight Reports that, in its view, show a connection between the CIA and the records sought: (1) "[a] March 14, 2017 [meeting] between President Trump, Kushner, and Saudi Deputy Crown Prince Mohammed Bin Salman, [where] officials from IP3 continued to promote their plan with high-level stakeholders—including . . . CIA Director Mike Pompeo," Dkt. 26-2 at 5 (Pl.'s SUMF ¶ 18) (quotation marks omitted); (2) "[a]n April 23, 2017 email from IP3 CEO Hewitt to an employee of Barrack's company, Colony NorthStar, [that] included a two[-]pager summary that has been used by many of the Cabinet Secretaries, Pompeo, others," *id.* at 6 (Pl.'s SUMF ¶ 18) (emphasis and quotation marks omitted); and (3) "[a]n August 4, 2017 email from Hewitt to a Defense Department official attaching a presentation IP3 gave Kushner in August about IP3's plan[, which] notes [that] [o]ther Cabinet officials briefed [included] Rick Perry, Wilbur Ross and Mike Pompeo," *id.* (emphasis and quotation marks omitted).

This is a far cry from "official acknowledgment." In *ACLU*, the *CIA*'s *Glomar* response was defeated on the basis of detailed public statements from the President, the President's counterterrorism advisor, and the Director of the CIA. Here, by contrast, there exists only a congressional report recounting a private businessman's two emails and a reference to efforts made by IP3 "to promote their plan with high-level stakeholders—including . . . Pompeo." Dkt. 26-2 at 5 (Pl.'s SUMF ¶ 18) (quotation marks omitted). The "strict" official acknowledgement doctrine requires more. *Leopold*, 987 F.3d at 170; *see also James Madison Project v. CIA*, 344 F. Supp. 3d 380, 394 (D.D.C. 2018) ("The Court cannot speculate that specific documents exist within individual agencies based on general pronouncements in the public domain . . . . To do so

would violate the strict requirements of the official acknowledgment doctrine which demands 'exactitude,' particularly in cases like this one where national security and foreign affairs are involved.").

Beyond this difficulty, the D.C. Circuit has cautioned courts "not [to] deem 'official' a disclosure made by someone other than the agency from which the information is being sought." *Frugone*, 169 F.3d at 774; *see also Fitzgibbon*, 911 F.2d at 765–766 (CIA could refuse to disclose classified information even if allegedly referenced in congressional committee report); *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (same, regarding information allegedly reported in book by former CIA official); *Phillippi v. CIA*, 655 F.2d 1325, 1330–311 (D.C. Cir. 1981) (same, regarding information allegedly reported in book by former Director of Central Intelligence); *Salisbury*, 690 F.2d at 971 ("[B]are discussions by this court and the Congress of [the National Security Agency's] methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering."). GAP has adduced no evidence that the CIA itself—or any other executive agency or department for that matter—has ever acknowledged *vel non* the records that GAP now seeks. That, too, vitiates GAP's reliance on the official acknowledgement doctrine.

Finally, GAP argues that the records it seeks shed light on "embarrassing or possibly illegal conduct" and thus fall outside Executive Order 13526's coverage. Dkt. 26-1 at 19–21; *see also* Exec. Order 13526 § 1.7(a) ("In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency . . . ."). "A plaintiff alleging that an agency has classified information to conceal a violation of law 'must provide something more than conjecture to show that the agency's

withholding decision violates Executive Order 13,526.'" *Smith v. U.S. Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d 85, 97 (D.D.C. 2019) (quoting *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96–97 (D.D.C. 2017)).  Instead, the Court must find "credible evidence that the agency's motives for its withholding decisions were improper." *Canning v. U.S. Dep't of Just.*, 848 F. Supp. 1037, 1047 (D.D.C. 1994); *see also Smith*, 415 F. Supp. 3d at 97.

That evidence is missing here.  The Shiner declaration avers that the CIA's "determination that the existence or nonexistence of the requested records is classified and has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security." Dkt. 24-3 at 11 n.2 (Shiner Decl. ¶ 21).  The Court has no reason to doubt that averment at this juncture, conclusory as it may be. *Cf. SafeCard Servs*, 926 F.2d at 1200 ("Agency affidavits are accorded a presumption of good faith . . . .").  Indeed, even accepting GAP's telling of the pertinent events, GAP has provided no evidence that the CIA's *Glomar* response was motivated by, or for the purpose of, concealing any malfeasance.  Exec. Order 13526 § 1.7(a).

This conclusion could change, of course, if the records that are eventually released by the other defendants in this case (or any other evidence) call the CIA's motives into question.  For now, however, that prospect is entirely speculative; but if GAP can eventually prove that it is right, it may renew its motion for summary judgment.  On the present record, and in light of the plausible national security justifications proffered in favor of the CIA's *Glomar* response, the Court concludes that GAP has not satisfied its burden under § 1.7.

4. *Exception*

There is one category of records that neither party has addressed in detail and that might not, necessarily, reveal the CIA's intelligence interests (or non-interests): unsolicited communications from third parties that, for whatever reason, are responsive to GAP's FOIA request. One can imagine, for instance, that a lobbyist or business might send the Director of the CIA a briefing paper that is also sent to dozens of other executive branch officials, which the CIA merely receives and sticks in a file. The Director's purely passive receipt of a copy of that hypothetical paper would, in all likelihood, say nothing about the CIA's interests or activities; the submission might say something about the sender's interests and activities, but that is beside the point.

It is hard to see how revealing whether such unsolicited records exist would expose the agency's intelligence interests, methods, or sources in a manner that could imperil national security. At least in passing, the CIA suggests otherwise, asserting that "the majority of CIA relationships with outside entities are, in fact, classified." Dkt. 46 at 8. But that statement is unsupported by any citation to the record (and the factual record does not support the assertion in any event). Nor is the logic or plausibility of the CIA's position self-evident. The Court can, of course, imagine circumstances in which an unsolicited communication might reveal a classified or secret relationship, just as the Court can imagine unsolicited communications that would reveal nothing about the CIA's interests, methods, or sources. Reliance on the Court's imagination, however, is not how this works. The CIA carries the burden, 5 U.S.C. § 552(a)(4)(B), and it must offer a reasoned explanation in a declaration or affidavit that supports its position, *SafeCard*, 926 F.2d at 1200. Here, the CIA has done neither—it has offered no

reason nor any evidence to support its suggestion that the identity of virtually any private party that might contact the Agency about a matter of policy is classified.

Accordingly, as to such unsolicited communications, if any, the Court must deny the CIA's motion for summary judgment. But because GAP only alludes to this argument, and because neither party has developed the issue, the Court is not prepared—at least on the present record—to grant summary judgment in GAP's favor on this issue. For present purposes, the Court will merely reserve judgment on the question and will permit both parties to renew their respective motions as appropriate.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that GAP's motion for summary judgment, Dkt. 26, is **DENIED** without prejudice; it is further

**ORDERED** that the CIA's motion for summary judgment, Dkt. 24, is **GRANTED** in part, as to all aspects of its *Glomar* response with the exception of any unsolicited records, as discussed in section III.B.4 above; it is further

**ORDERED** that the CIA's motion for summary judgment is **DENIED** in part without prejudice, as to any such unsolicited records; and it is further

**ORDERED** that GAP and the CIA shall, on or before August 20, 2021, file a joint status report with the Court proposing a schedule for further proceedings in this matter.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 7, 2021