UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY,<br><br>Defendant. | Civil Action No. 19-0449 (RDM) |

**THE CENTRAL INTELLIGENCE AGENCY'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

**I.   PLAINTIFF'S COMPLAINTS ABOUT THE TIMELINESS OF THE AGENCY'S RENEWED MOTION FOR SUMMARY JUDGMENT ARE MERITLESS.**

In its July 7, 2021 Memorandum Opinion and Order, the Court directed the parties to file a "joint status report . . . proposing a schedule for further proceedings in this matter" on or before August 20, 2021. Dkt. No. 72 at 27 ("Mem. Op."). The parties did not to do so. For its part, the Agency apologizes for any inconvenience that may have caused.

It does not follow, however, that the parties' shared failure in this regard renders the Agency's (and only the Agency's) renewed motion for summary judgment untimely. *Contra* Resp. at 3-4, Dkt. No. 83. To start, "the Court, not the parties, sets the briefing schedule," *McGehee v. United States Dep't of Justice*, 362 F. Supp. 3d 14, 18 (D.D.C. 2019). So even if the parties had timely complied with the Court's directive here, the status report would have at most *suggested* briefing deadlines; it could not have imposed them without additional action by the Court. *See* Mem. Op. at 27. Plaintiff's unsupported contention (*see* Resp. 4) that a party's failure

to propose a filing deadline renders untimely any pleading eventually submitted is both counterintuitive and inconsistent with the Court's "broad discretion" to decide "case management and scheduling matters" in the cases on its docket. *See McGehee*, 362 F. Supp. 3d at 18.

Plaintiff's argument is also incompatible with Rule 56. Under Rule 56(b), unless a court directs otherwise, a party is free to "file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b); *see* LCvR 7(l) ("A dispositive motion in a civil action shall be filed sufficiently in advance of the pretrial conference that it may be fully briefed and ruled on before the conference."). Here, the Court endorsed the Agency's proposed scheduling order governing the parties' renewed summary judgment filings on February 9, 2022, one week *after* the Agency filed its renewed motion. *See* Minute Order at 1 (filed Feb. 9, 2022); Renewed Mot. for Summ. J., Dkt. No. 79 (filed Feb. 2, 2022). Regardless of when or whether the Agency proposed that schedule, *see* Resp. at 3, the Agency's renewed summary judgment motion accordingly cannot have been untimely because, at the time it was filed, no deadline for such motions existed.[1]

Plaintiff's notion that the Agency was required to seek leave under Rule 6(b) because it filed its renewed motion "after the expiration of the designated time period," Resp. 4, is incorrect for the same reason: at the time the Agency filed its motion, no such time period—beyond that created by Rule 56(b) and LCvR 7(1)—had been "designated." And contrary to Plaintiff's assertion (Resp. 4), neither *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), nor *Smith v. District of Columbia*, 430 F.3d 450 (D.C. Cir. 2005), suggests otherwise. In both cases, the

---

[1] Plaintiff does not (and cannot) contend that the Agency failed to file its renewed motion in accordance with Rule 56 or LCvR 7. And to the extent the Plaintiff believes that the Agency was obligated to participate in a pre-filing conference before doing so, *see* Resp. 3, Plaintiff is wrong. This Court does not require pre-filing conferences for dispositive motions. *See* LCvR 7(m).

relevant question was whether the district court had dealt appropriately with a party who had failed to comply with a briefing order *then in effect*. *See Lujan*, 497 U.S. at 894-895 (noting that the district court had rejected supplemental summary judgment affidavits as "untimely and in violation of [the court's briefing] Order") (quotation omitted, brackets in original); *Smith*, 430 F.3d at 456-457 (concluding that where "[t]he district court had set December 27, 2002, as the deadline for the District to file motions for summary judgment," the court abused its discretion by permitting the District to file a motion for summary judgment several months later without first seeking leave under Rule 6(b)).[2]

Finally, Plaintiff's timeliness complaint overlooks that the Court directed *the parties* to file a status report on or before August 21, 2021, and that the Plaintiff failed to do so, as well. If the Court were inclined to impose a sanction for that collective error, it would therefore be fundamentally unfair to force the Agency to bear it alone—particularly in light of Plaintiff's duty to diligently and efficiently prosecute its own case. *Cf., e.g.*, *Allen v. United States*, 277 F.R.D. 221, 223 (D.D.C. 2011) ("A court acts in its discretion by dismissing a complaint, either with or without prejudice, when a plaintiff fails to prosecute his or her case, fails to follow the rules of the court or fails to follow the court's orders."); Fed. R. Civ. P. 41(b); LCvR 83.23.

---

[2] To be sure, the Agency proposed its briefing schedule in a monthly status report filed after the Court's August 20, 2021 deadline, *see* Dkt. No. 76, and Plaintiff is therefore at least arguably correct that the Agency should have first sought leave to do so under Rule 6(b). *See* Resp. 3-4; Fed. R. Civ. P. 6(b)(1)(B). But if that is the case, Plaintiff's subsequent motion to ratify the Agency's proposed schedule should have been accompanied by a similar request. After all, the Court directed *the parties* to submit a proposed briefing schedule by August 20, 2021, not just the Agency. Mem. Op. at 27. The Court need not decide these questions, however, because it has since ratified the Agency's proposed schedule and the parties have submitted their renewed summary judgment filings in accordance with it. Minute Order at 1 (Feb. 9, 2022); Dkt. Nos. 79 and 83. And in any event, whether the parties fully complied with Rule 6 in proposing a briefing schedule has no bearing on whether the Agency's renewed motion was timely filed, because the filing of a proposed briefing schedule is not a precondition to a party's ability to move for relief under Rule 56. *See* Fed. R. Civ. P. 56(b).

## II. THE AGENCY'S *GLOMAR* RESPONSE ENCOMPASSES RESPONSIVE RECORDS DERIVED FROM "UNSOLICITED COMMUNICATIONS FROM THIRD PARTIES."

The Agency issued a *Glomar* response in this case because the fact of the existence *vel non* of records that might be responsive to Plaintiff's FOIA request is itself currently and properly classified under Executive Order 13526 and exempt from disclosure. *See* Mem. Op. 14-19. As the Agency has explained, *see* Renewed Mot. for Summ. J. at 2-3; Blaine Decl. ¶ 8, under the facts presented here, the propriety of that response does not turn on whether any responsive records that may or may not exist were acquired from solicited or unsolicited sources. Given the nature of the information Plaintiff seeks, the fact of the existence (or non-existence) of any responsive records, however acquired or derived, fits squarely within several of the classification categories identified in Section 1.4 of Executive Order 13526, *see* Mem. Op. at 16, and if disclosed, would tend to elucidate "the scope and nature of CIA's intelligence activities and interests," and thereby interfere with the Agency's ability to "operate as an effective clandestine intelligence agency" and "enable foreign organizations to counter CIA's efforts and to threaten the United States." *See id.* at 17-18; Renewed Mot. for Summ. J. at 2-3; Blaine Decl. ¶¶ 6-8.

Plaintiff does not contest that any such records would fall into one or more of Executive Order 13526's classification categories, and nor could it. This Court has already held that "the *subject matter* of [its] request falls within the coverage of Executive Order 13526." Mem. Op. 14; *see id.* at 16 ("The disclosure of [the] information [that Plaintiff seeks]—or the absence of any such information—is precisely what subsections (b), (d), (e), and (h) of Executive Order 13526 safeguards against."). Instead, Plaintiff's principal claim is that the Agency may possess records of "unsolicited communications" that are irrelevant to its clandestine intelligence mission (and thus potentially beyond the scope of its *Glomar* response) but nevertheless somehow are responsive to the Plaintiff's FOIA request. *See* Resp. at 5-6.

4

That unsupported supposition, however, cannot be squared with the Agency's attestations. The Agency has declared that if it were to possess any such records, it would be precisely and exclusively "because of [their] relevance to the Agency's mission." Blaine Decl. ¶ 6. And as with all other hypothetically responsive records in this case, *contra* Resp. 7, there is no doubt as to which expressly classified aspects of the Agency's mission any such records would relate: the potential collection of intelligence relating to "(i) discussion or initiatives related to civil nuclear and/or cyber cooperation with Middle Eastern countries; (ii) economic policy proposals; and/or (iii) policy responses to the Westinghouse bankruptcy." Shiner Decl. ¶ 8; *see* Blaine Decl. ¶ 7 ("Regardless of whether an Agency record is derived from solicited or unsolicited information, the record's mere existence or non-existence tends to reveal whether the CIA has a mission-related interest in, or connection to, the record's subject."); Mem. Op. at 14-16. Revealing the existence or non-existence of any "unsolicited" responsive records would therefore run afoul of the same provisions of Executive Order 13526, and risk the same harms to the national security, that this Court found sufficient to justify the Agency's *Glomar* response in the first instance. *See* Blaine Decl. ¶¶ 7-8; Renewed Mot. for Summ. J at 2-3.

Plaintiff's attempts to undermine these assertions are unconvincing. *See Wolf v. Central Intelligence Agency*, 473 F.3d 370, 375 (D.C. Cir. 2009) ("[S]ummary judgment is warranted on the basis of agency affidavits when the affidavits . . . are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."). Initially, neither the Federal Records Act nor NARA's accompanying regulations contemplate that an agency will retain as a record information that is not relevant to the agency's business. *Contra* Resp. 4-6. That follows from two facts, both of which Plaintiff ignores. *First*, and contrary to Plaintiff's contention (Resp. 4), the FRA's definitional criteria for a "record" are expressly collective: "documents must be

'made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business' *and* 'preserved or appropriate for preservation by that agency . . . as evidence of the . . . activities of the Government.'" *Consumer Federation of America v. United States Dep't of Agric.*, 455 F.3d 283, 289 (D.C. Cir. 2006) (emphasis added, citing *Forsham v. Harris,* 445 U.S. 169, 183 & n.14 (1980)); *see* 44 U.S.C. § 3301(a); *accord* 36 C.F.R. § 1220.18; Meghan M. Stuessy, Congressional Research Serv., FEDERAL RECORDS: TYPES AND TREATMENTS 1 (2019) ("Congress deemed federal records worthy of preservation for the information they provide on the transaction of public business *and also* because they document the 'organization, functions, policies, decisions, procedures, and essential transactions' of the government.'") (emphasis added; quoting 44 U.S.C. § 3301).  The FRA thus nowhere suggests that an agency will "possess records that it made or received but that ultimately are not appropriate for preservation."  Resp. 5.  Instead, a document's mere existence as a record signifies that it satisfies both criteria.  *See Forsham*, 445 U.S. at 183 n.14.

*Second*, NARA's regulations provide that "nonrecord materials," or information that comes into an agency's possession but does not meet the FRA's two-pronged definition of a "record" (presumably like the documents Plaintiff believes the Agency may possess here) need not be retained, and "should be purged when no longer needed for reference."  36 C.F.R. § 1222.16(b)(3); *see* 44 U.S.C. § 3301(a)(1)(B).  If either the FRA or NARA's regulations contemplated that agencies should retain as records information that satisfied only one of the FRA's definitional criteria, this guidance would be unnecessary.

Moreover, neither the FRA nor NARA conditions a determination of a record's relevance to the agency's mission on a finding that the record is of "permanent," rather than "transitory" value.  *Contra* Resp. 5-6.  Instead, "[o]nce recorded information *is determined to be a federal*

6

*record*, agencies must *then* work with NARA to determine whether it is a permanent record, which means it has permanent value and should be maintained in perpetuity by the federal government, or if it is a temporary record, which means the document may be destroyed after a period of time." Stuessy at 2 (emphases added); *see* 36 C.F.R. § 1225.10 (providing that "[a]ll *Federal records*" must be subject to a disposition schedule) (emphasis added).

Next, the definitional criteria for an "agency record" under FOIA is irrelevant. *See* Resp. 6. The question presented here is not whether particular records of unsolicited communications qualify as "agency records" that may be subject to Plaintiff's FOIA request. *Contra id.* at 7. It is whether the Agency may refuse to confirm or deny the very existence of any such records because the fact of their existence or non-existence, standing alone, is currently and properly classified under Executive Order 13526, and exempt from disclosure. *See* Mem. Op. at 26. The scope of FOIA's application, or even the extent to which the definition of "records" under the FRA and an "agency record" under FOIA overlap, has no bearing on that antecedent question.[3]

---

[3] In any event, Plaintiff is wrong to suggest that the "unsolicited" records at issue, should they exist, would necessarily be subject to release in some form simply by the "mere happenstance that the CIA had" them "within its files." *See* Resp. 6-7. "Agency records" do not "encompass all documents in the possession of a FOIA-covered agency." *Cause of Action Inst. v. Office of Management and Budget*, 10 F. 4th 849, 855 (D.C. Cir. 2021). "Rather, the term . . . extends only to those documents that an agency both (1) create[s] or obtain[s], and (2) controls . . . at the time the FOIA request [was] made." *Id.* And importantly, indicia of sufficient "control" include (among other things) "the intent of the document's creator to retain or relinquish control over the records," "the extent to which agency personnel have read or relied upon the document," and "the degree to which the document was integrated into the agency's record system or files." *Id.* (internal quotation omitted). A determination that the records at issue are "agency records" under FOIA, in other words, would also likely compel the conclusion that the Agency's *Glomar* response protects the fact of their existence or non-existence from disclosure—even before the Agency considered whether they were subject to one of FOIA's exemptions. And conversely, of course, if it were determined that the records were not "agency records," they would not be subject to release by the Agency at all.

Finally, Plaintiff's claim (Resp. 5, 8) that accepting the Agency's position would "render the entirety of the [A]gency's documents exempt from disclosure under the FOIA" is overblown. The Agency has not advocated for such a rule, and it is not even a logical extension of the Agency's argument. This Court has determined that, given the particular facts of this case and the uniquely sensitive nature of the information sought in Plaintiff's FOIA request, the fact of the existence or non-existence of responsive records is currently and properly classified and not subject to disclosure. Mem. Op. 14-19. The Agency's position is simply that there is no reason for that holding to be applied selectively, depending on how any such responsive records may or may not have been acquired.

### III.  A SEARCH FOR "UNSOLICITED" RESPONSIVE RECORDS WOULD BE IMPRACTICABLE.

Plaintiff's assertion (Resp. 9-10) that the Agency has failed to demonstrate that it conducted an adequate search for responsive records derived from "unsolicited" sources likewise fails for at least two reasons. *First*, no searches have been conducted in this case because the Agency has asserted that the fact of the existence or non-existence of the records at issue falls within the scope of its *Glomar* response. Renewed Mot. for Summ. J. at 2-3; *see Wolf*, 473 F.3d at 374 n.4 ("[W]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.") (internal quotation omitted); *Electronic Privacy Information Center v. National Security Agency*, 678 F.3d 926, 934 (D.C. Cir. 2012) ("Because we find the Janosek Declaration sufficient to support NSA's *Glomar* response, requiring NSA to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise.").

*Second*, even with respect to any hypothetical searches that the Court might order, Plaintiff overlooks that an agency "is not required to expend its limited resources on searches for which it is clear at the outset that no search will produce the records sought," *Reyes v. Environmental Protection Agency*, 991 F. Supp. 2d 20, 27 (D.D.C. 2014); *Thomas v. Comptroller of Currency*, 684 F. Supp. 2d 29, 33 (D.D.C. 2010). The Agency's Information Review Officer has explained that the Agency "does not create, retain, or categorize records according to whether they were derived from solicited or unsolicited information." Blaine Decl. ¶ 9. There accordingly "are no potential search terms [the Agency] could use to locate responsive documents," or any "potential avenues [to] consider[]" (Resp. at 10), because the criterion that would render a hypothetical record responsive—its "unsolicited" character—is not recognized by, or reflected in, the Agency's record systems. *See* Blaine Decl. ¶ 9 ("I am unaware of any search terms or restrictions that would enable the Agency to conduct a meaningful search" for the records at issue.). On the facts of this case, the Agency's good-faith attestation that searching for the records at issue would be impracticable is therefore all that the FOIA requires. *See American-Arab Anti-Discrimination Committee v. Dep't of Homeland Sec.*, 516 F. Supp. 2d 83, 88 (D.D.C. 2007) (Official's attestation that agency did not maintain the information requested was "sufficient—if not exactly to show the adequacy of the search, then to explain why a search would be futile and is unnecessary"); *Thomas*, 684 F. Supp. 2d. at 33 (agency's refusal to search was "reasonable under the circumstances" where "the information . . . requested [was] not the type of information the [agency] maintain[ed]" and requests were incompatible with agency's record system).

Indeed, Plaintiff's suggestion for a hypothetical search (Resp. 10) demonstrates why forcing the Agency to search for the "unsolicited" records at issue would be futile. If so directed, the Agency might be able to search for "all communications sent by identified individuals or non-

9

governmental email accounts pertaining to specified search terms drawn from Plaintiff's FOIA request." *Id.* But even if it were to do so, the search necessarily would "sweep in both solicited and unsolicited communications," *see id.*, because the Agency has no meaningful way to differentiate between the two. *See* Blaine Decl. ¶ 9. And without such a filtering mechanism, the Agency would be unable to discern which records should be reviewed for possible production and which should be "eliminate[d] [as] non-responsive." Resp. at 10. This ostensibly "reasonable" search—like any other hinging on the "unsolicited" criterion—therefore would be functionally equivalent to "no search at all." *Earle v. United States Dep't of Justice*, 217 F. Supp. 3d. 117, 123 (D.D.C. 2016); *see Goland v. Central Intelligence Agency*, 607 F.2d 339, 353 (D.C. Cir. 1978) (affirming Agency's decision to forgo a manual search of its records in part because even if such a search had been conducted, it would have been "impossible to determine which documents, if any" were responsive to the plaintiff's request); *cf. Lockett v. Wray*, 271 F. Supp. 3d 205, 209-210 (D.D.C. 2017) (granting summary judgment to an agency based "solely on its documented inability to search"); *Moore v. National DNA Index System*, 662 F. Supp. 2d 136, 139 (D.D.C. 2009) ("Under these circumstances—where a search . . . is, by design, literally impossible for the defendants to conduct—not searching satisfies the FOIA requirement of conducting a search that is reasonably calculated to uncover responsive documents.").

**CONCLUSION**

For these reasons and those previously stated, the Central Intelligence Agency's Renewed Motion for Summary Judgment should be granted.

Dated: April 5, 2022
Washington, DC

                                  Respectfully submitted,

                                  MATTHEW M. GRAVES, D.C. Bar. #481052
                                  United States Attorney

                                  BRIAN P. HUDAK
                                  Acting Chief, Civil Division


By: _____/s/_____
      PATRICIA K. MCBRIDE
      Assistant United States Attorney
      555 Fourth Street, NW
      Washington, DC 20530
      202-252-7123

*Attorneys for Defendant*