**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

GOVERNMENT ACCOUNTABILITY
PROJECT,

        *Plaintiff*,

   v.

CENTRAL INTELLIGENCE AGENCY,

        *Defendant*.

Civil Action No. 19-449 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

In this Freedom of Information Act case, 5 U.S.C. § 552, Plaintiff Government

Accountability Project ("GAP") requested that the Central Intelligence Agency ("CIA")—as well

as the Departments of Commerce, Treasury, Defense, and Energy—release certain records

relating to civil nuclear cooperation with countries in the Middle East.  Dkt. 1 at 28–40 (Compl.

¶¶ 85–134).  In response, the CIA declined either to confirm or to deny the existence or

nonexistence of any responsive records and explained that this nonresponse response—referred

to as *Glomar* response—was necessary to avoid harm to national security.

The Court previously decided that the CIA's *Glomar* response was proper as to all but

one category of documents that GAP seeks.  *See Gov't Accountability Project v. Cent. Intel.

Agency*, 548 F. Supp. 3d 140, 158 (D.D.C. 2021) ("*GAP I*").  The Court reserved judgment on

the propriety of the CIA's nonresponse response as to unsolicited communications from third

parties, however, *see id.*, and takes up that question now on the parties' renewed partial cross-

motions for summary judgment.

For the reasons that follow, the Court will **GRANT** the CIA's motion, Dkt. 79, and will **DENY** GAP's motion, Dkt. 84.

## I. BACKGROUND

The Court has previously described the factual background of this case in detail, *see GAP I*, 548 F. Supp. 3d at 144–47, and, for present purposes, recounts only the limited context necessary for the disposition of the pending motions. At issue here, according to GAP, is the fidelity of certain officials in the Trump Administration to the safeguards of the Atomic Energy Act of 1954, which governs how the United States may cooperate with other countries on the subject of nuclear material. *See id.* at 144–45. The Act articulates, for example, the processes that the executive branch must follow before nuclear cooperation is permitted and the terms that must be included in any resulting nuclear cooperation agreements between the United States and a foreign country. 42 U.S.C. § 2153(a)(1), (c). The Act's provisions were "designed to permit cooperation where, upon weighing th[e] risks (of proliferation) in light of the safeguards provided, there is found to be no unreasonable risk to the common defense and security." *See* S. Rep. No. 83-1699, at 22.

On August 29, 2018, GAP submitted a FOIA request to the CIA seeking records "from January 20, 2017 to the present regarding: (1) civil nuclear cooperation with Middle Eastern countries, most notably Saudi Arabia; (2) the Middle East Marshall Plan; (3) negotiation of a U.S.-Saudi '123' Civil Nuclear Cooperation Agreement; (4) the IP3 Corporation and its proposal for nuclear and cyber cooperation with various Middle Eastern countries; and (5) Westinghouse, including its March 2017 bankruptcy and the subsequent policy response of the U.S. Government." *GAP I*, 548 F. Supp. 3d at 146; *see also* Dkt. 1 at 28 (Compl. ¶ 85); Dkt. 24-2 at 1 (Def.'s SUMF ¶ 1). After a series of exchanges between GAP and the CIA to clarify the scope

of GAP's FOIA request, and "[b]efore the CIA provided a substantive response," Dkt. 24-2 at 2

(Def.'s SUMF ¶ 5), GAP brought suit to compel the CIA to release any responsive records, Dkt.

1.  While the litigation was ongoing, "the CIA completed its review of [GAP's] FOIA request

and determined that, in accordance with section 3.6(a) of Executive Order 13,526, it could

neither confirm nor deny the existence or nonexistence of records responsive to [GAP's] FOIA

request." Dkt. 24-2 at 2–3 (Def.'s SUMF ¶ 5).[1]  That was because "confirming or denying the

existence or nonexistence of the requested records would reveal classified information that is

protected from disclosure by executive order and federal statute." *Id.* at 3 (Def.'s SUMF ¶ 6).  In

particular, the CIA averred, "[c]onfirming or denying whether the CIA has information

responsive to the requests at issue would cause harm to national security." *Id.*

      Upon consideration of the CIA's and GAP's initial cross-motions for partial summary

judgment, Dkts. 24, 26, the Court concluded that the agency's *Glomar* response was, in large

part, proper under FOIA Exemption 1, *see GAP I*, 548 F. Supp. 3d at 151; 5 U.S.C. § 552(b)(1).

The Court was unpersuaded, however, that the CIA had carried its burden with respect to one

category of records that neither party had "addressed in detail" in their initial motions for

summary judgment: "unsolicited communications from third parties that, for whatever reason,

are responsive to GAP's FOIA request." *GAP I*, 548 F. Supp. 3d at 158.  Because the CIA had

not "offered [any] reason [or] . . . evidence to support its suggestion" that these communications

are "classified," and because "GAP only allud[ed] to this argument" in its initial cross-motion,

---

[1]  Section 3.6(a) of Executive Order 13526 provides: "[I]n response to a request for information under the Freedom of Information Act, the Presidential Records Act, the Privacy Act of 1974, or the mandatory review provisions of this order[,] . . . [a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  Executive Order No. 13526 ("EO 13526"), 75 Fed. Reg. 707 (Jan. 5, 2010).

the Court reserved judgment on the question and permitted both parties to renew their respective

motions. *Id.* Both the CIA and GAP have now done so.[2] *See* Dkts. 79, 84. Meanwhile, the

Departments of State and Energy continue to process and release non-exempt, responsive

records. *See* Dkt. 92.

## II. LEGAL STANDARD

FOIA is designed to "protect[] the basic right of the public 'to be informed about what

their government is up to,'" *Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020) (quoting

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 150 (D.C. Cir. 2016)), and

embraces "a general philosophy of full agency disclosure," *U.S. Dep't of Def. v. FLRA*, 510 U.S.

487, 494 (1994) (internal quotation marks omitted). But because Congress has recognized that

"legitimate governmental and private interests could be harmed by release of certain types of

information," *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101, 102 (D.C. Cir. 2017)

(quoting *Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988)), Congress has exempted nine categories

of records from FOIA's disclosure requirements, 5 U.S.C. § 552(b)(1)–(9). In light of FOIA's

---

[2] In *GAP I*, this Court ordered GAP and the CIA to file a joint status report on or before August
20, 2021, proposing a schedule for further proceedings in this matter. *See* 548 F. Supp. 3d at
159. The parties failed to do so, and it was not until November 2, 2021 that the CIA proposed a
briefing schedule for its renewed partial motion for summary judgment. Dkt. 76 at 2. GAP
subsequently requested that the Court "endorse[]" that briefing schedule, Dkt. 82 at 1, which the
Court did, *see* Min. Order (Feb. 8, 2022). GAP now maintains that the Court should deny the
CIA's renewed motion for summary judgment as untimely. The Court is unpersuaded.
Although *both* parties failed to comply with the Court's order to "file a *joint* status report . . .
proposing a schedule for further proceedings," 548 F. Supp. 3d at 159 (emphasis added), it is a
stretch too far to suggest that the CIA missed a deadline for filing its renewed motion for
summary judgment. To the contrary, the Agency filed its motion on the schedule that it
(belatedly) proposed, that GAP asked the Court to approve, Dkt. 82 at 1, and that the Court
adopted. *See* Fed. R. Civ. P. 56(b) ("Unless a different time is set by local rule or the court
orders otherwise, a party may file a motion for summary judgment at any time until 30 days after
the close of all discovery."). The Court, accordingly, declines to deny the CIA's motion for
summary judgment on timeliness grounds.

preference for disclosure, these exemptions are to be "narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982).

On rare occasion, an agency "may refuse to confirm or deny the existence of records" in response to a FOIA request. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)). "Such an agency response is known as a *Glomar* response," *id.*, and presents "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request," *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). A *Glomar* response "is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption," *Wolf*, 473 F.3d at 1074—that is, if the very act of answering "the FOIA inquiry would cause harm cognizable under an FOIA exception," *id.* (quoting *Gardels*, 689 F.2d at 1103). Accordingly, in assessing a *Glomar* response, "courts apply the general exemption review standards established in non-*Glomar* cases." *Id.* Thus, even where an agency declines to confirm or deny that it maintains any responsive records, it still bears the burden of justifying its decision. *See* 5 U.S.C. § 552(a)(4)(B); *see also Fed. Open Mkt. Comm. of the Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 352 (1979); *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

To meet that burden, an agency must submit "relatively detailed and non-conclusory" affidavits or declarations explaining why its *Glomar* response was merited. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted). The Court, in turn, must review the agency's affidavits or declarations *de novo*. 5 U.S.C. § 552(a)(4)(B). But, as the D.C. Circuit has cautioned, "*de novo* review in FOIA cases is not everywhere alike," *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). That is especially so in the face "of national security concerns," where

"courts must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Wolf*, 473 F.3d at 374 (emphasis omitted) (citations and internal quotation marks omitted); *see also Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[B]oth the Supreme Court and this Court have expressly recognized the propriety of deference to the executive in the context of FOIA claims which implicate national security.").

FOIA cases are typically resolved on motions for summary judgment. *See, e.g., Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011). In a FOIA case, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (quoting *Mil. Audit Project*, 656 F.2d at 738). In the *Glomar* context, however, a reviewing court must "take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980).

### III.  ANALYSIS

In *GAP I*, this Court held that the CIA had, in large part, satisfied its burden of justifying its *Glomar* response to GAP's FOIA request. 548 F. Supp. 3d at 151. In particular, the Court concluded that the CIA's non-response response was justified by FOIA Exemption 1, which permits an agency to withhold "matters that are . . . specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign

6

policy and [that] are in fact properly classified pursuant to such Executive order." 5 U.S.C.

§ 552(b)(1); *see also Salisbury v. United States*, 690 F.2d 966, 971–72 (D.C. Cir. 1982).

Both in its initial motion and in its renewed motion, the CIA relies on Executive Order

13526, which authorizes the classification of information pertaining to, among other things,

"foreign government information," Exec. Order 13526 § 1.4(b), "foreign relations or foreign

activities of the United States," *id.* § 1.4(d), "scientific, technological, or economic matters

relating to the national security," *id.* § 1.4(e), "United States government programs for

safeguarding nuclear materials or facilities," *id.* § 1.4(f), and "the development, production, or

use of weapons of mass destruction," *id.* § 1.4(h)—so long as "unauthorized disclosure" of such

information "could reasonably be expected to cause identifiable or describable damage to the

national security," *id.* § 1.4.  In *GAP I*, this Court determined that the disclosure of information

requested by GAP here—or the absence of any such information—is precisely what subsections

(b), (d), (e), (f), and (h) of Executive Order 13256 safeguard against.  *GAP I*, 548 F. Supp. 3d at

152.  The Court concluded, moreover, based on the declaration submitted by the CIA with its

initial motion, that the "disclosure of whether the CIA possesses records responsive to GAP's

FOIA request" could "reasonably be expected to cause identifiable or describable damage to the

national security." *Id.* at 154.

For present purposes, the Court need not revisit whether the subject matter of GAP's

FOIA request "pertains to a type of information enumerated in Executive Order 13526." *Id.* at

151.  At issue now, rather, is the far narrower question of whether acknowledging that the

agency has—or does not have—"unsolicited communications from third parties that, for

whatever reason, are responsive to GAP's FOIA request" would "expose the agency's

intelligence interests, methods, or sources in a manner that could imperil national security." *Id.*

at 158.  Neither party addressed this sub-category of records in detail in their initial motions for summary judgment, and, in the absence of any explanation, the Court expressed skepticism in *GAP I* that "the Director's purely passive receipt of a copy of [a] hypothetical [briefing] paper," for example, would "say [any]thing about the CIA's interests or activities."  *Id.*  The Court now addresses that previously unanswered question.

## A.    National Security Interests

In its renewed motion for summary judgment, the CIA contends that the Court's conclusions in *GAP I* apply with "equal force" to agency records, if any, derived from unsolicited communications, since it would maintain any such records only if "the [a]gency has concluded that they are relevant [to] the Agency's mission."  Dkt. 79 at 8.[3]  In support of that argument, the CIA has submitted the declaration of Vanna Blaine, the Information Review Officer ("IRO") for the Litigation Information Review Office at the CIA, which also incorporates by reference the previously relied-up declaration of Antoinette B. Shiner, a prior IRO at the CIA.  Dkt. 80-1 at 1, 3 (Blaine Decl. ¶¶ 1, 4).  The Shiner Declaration explained, in support of the CIA's initial motion for summary judgment, that a non-*Glomar* response to GAP's request would pose a cognizable threat to national security because it would, among other things, (1) provide foreign governments "insight into the scope and nature of CIA's intelligence activities and interests," Dkt. 24-3 at 13 (Shiner Decl. ¶ 23), (2) impinge on the CIA's ability "to operate as an effective clandestine intelligence agency," *id.* (Shiner Decl. ¶ 24), and (3) enable foreign organizations to threaten the United States, *id.* at 11–12 (Shiner Decl. ¶ 22).

---

[3] The CIA argues, moreover, that a search for any such "unsolicited" responsive records would be impracticable because it "does not create[,] retain[,] or categorize records according to whether they were derived from solicited or unsolicited information."  Dkt. 79 at 9 (quoting Dkt. 80-1 at 5 (Blaine Decl. ¶ 9)).  Because the Court concludes that the *Glomar* response is justified by FOIA Exemption 1, the Court need not address this alternative argument.

The Blaine Declaration, in turn, adds that these threats apply with equal force to unsolicited communications from third parties, if any, to the extent that they are responsive to GAP's FOIA request.  Dkt. 80-1 at 3 (Blaine Decl. ¶ 5).  At a basic level, Blaine does not disagree with the Court that "a third party's unsolicited *provision* of information to the Agency might itself say little 'about the CIA's interest or activities.'"  *Id.* at 4 (Blaine Decl. ¶ 7) (quoting *GAP I*, 548 F. Supp. 3d at 158).  But Blaine explains that "the Agency's subsequent *treatment* of that information, *i.e.*, whether the Agency retained it as a 'record' . . . reveals quite a bit."  *Id.* (Blaine Decl. ¶ 7).  Because, in accordance with the Federal Records Act ("FRA"),[4] the CIA "preserves as records information that is 'made or received under Federal law or in connection with the transaction of public business,' and which evidences 'the organization, function, policies, decisions, procedures, operations, or other activities of the [Agency],'" *id.* (Blaine Decl. ¶ 6) (quoting 44 U.S.C. § 3301(a)), the agency's records are, by definition, "relevan[t] to the Agency's mission," *id.* (Blaine Decl. ¶ 6).  Significantly, Blaine attests that, "[r]egardless of whether an Agency record is derived from solicited or unsolicited information, the record's mere existence or non-existence tends to reveal whether the CIA has a mission-related interest in, or connection to, the record's subject."  *Id.* (Blaine Decl. ¶ 7).

Any doubt regarding the rationale for the CIA's Glomar response, moreover, is put to rest by the next paragraph of Blaine's declaration, which she has submitted under the penalty of

---

[4] The Federal Records Act defines "record" as:

> all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

44 U.S.C. § 3301(a)(1)(A).

perjury.  She explains, without qualification, that "acknowledging the existence or nonexistence of records responsive to the Plaintiff's FOIA request would reveal whether or not the CIA had a mission-related interest in, or connection to: (i) discussions or initiatives related to civil nuclear and/or cyber cooperation with Middle Eastern countries; (ii) economic policy proposals; and/or (iii) policy responses to the Westinghouse bankruptcy." *Id.* at 4–5 (Blaine Decl. ¶ 8).  Perhaps most significantly, she also attests that she, based on her "careful review," she has concluded "that the fact of the existence or non-existence of any such records is currently and properly classified under Section 1.4 of Executive Order 13526, and therefore exempt from disclosure under FOIA exemptions (b)(1) and (b)(3)." *Id.* at 5 (Blaine Decl. ¶ 8).  Finally, she attests that her "determination that the fact of the existence or nonexistence of records responsive to the plaintiff's request is classified has not been made to conceal violations of law, inefficiency, or . . . to prevent embarrassment." *Id.* (Blaine Decl. ¶ 8 n.*).  In sum, the CIA's argument is that evidence of its retention (or non-retention) of unsolicited documents related to nuclear cooperation would reveal the CIA's (un-)involvement or (dis-)interest in such cooperative relationships.

The question for the Court, then, is whether "unauthorized disclosure" of unsolicited records responsive to GAP's FOIA request "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order 13526 § 1.4.  In making that assessment, the Court remains mindful that "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible," *Wolf*, 473 F.3d at 374 (internal quotation marks omitted), and that it is not the Court's role to second-guess such justifications when national security interests are legitimately at stake, *see Mil. Audit Project*, 656 F.2d at 738;

*Ctr. for Nat. Sec. Stud.*, 331 F.3d at 927; *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999);
*Ullah v. CIA*, 435 F. Supp. 3d 177, 184 (D.D.C. 2020).

Like the Shiner Declaration before it, the Blaine Declaration draws a "logical" and
"plausible" connection between the revelation that a non-*Glomar* response as to these documents
would produce and the risk to national security that such a response would precipitate.  *Wolf*, 473
F.3d at 374 (internal quotation marks omitted).  Notwithstanding the Court's initial skepticism as
to whether unsolicited communications would always "reveal [some]thing about the CIA's
interests, methods, or sources," *GAP I*, 548 F. Supp. 3d at 158, the Blaine Declaration cogently
explains that unsolicited documents maintained by the CIA as agency records are, by definition,
indicative of whether the CIA has a mission-related interest in, or connection to, the record's
subject, Dkt. 80-1 at 4 (Blaine Decl. ¶ 7).  And as the Court previously resolved in *GAP I*,
revealing the CIA's mission-related interest in the nuclear cooperation agreements and policy
responses at issue in GAP's FOIA request plausibly poses a threat to national security.  *See GAP
I*, 548 F. Supp. 3d at 153 (citing Dkt. 24-3 at 12–13 (Shiner Decl. ¶ 23)).  Once that threshold is
reached, as it is here, the Court must respect the executive's unique prerogative in matters of
national security.  *See Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977) ("Few judges have
the skill or experience to weigh the repercussions of disclosure of intelligence information.").  In
view of the deference that the executive is owed in this context, the Court concludes that the CIA
has sufficiently demonstrated that "unauthorized disclosure" of the unsolicited records sought by
GAP "could reasonably be expected to cause identifiable or describable damage to the national
security."  Exec. Order 13526 § 1.4.

**B.      Counterarguments**

GAP lodges two principal counterarguments to the CIA's reliance on Exemption 1 as to these unsolicited documents.  *See* Dkt. 84-1.  The Court addresses each in turn.

First, GAP contests the premise, articulated in the Blaine Declaration, that "in accordance with the Federal Records Act, the CIA preserves . . . information" that is "relevan[t] to the Agency's mission."  Dkt. 80-1 at 4 (Blaine Decl. ¶ 6).  Drawing on the text of the FRA and regulations issued by the National Archives and Records Administration, GAP contends that "an agency may *possess* records that it made or received but that are ultimately not appropriate for preservation."  Dkt. 84-1 at 8 (emphasis added).[5]  In GAP's view, those records that could be "possess[ed]" by an agency, but that need not be "preserv[ed]" under the FRA, might still fall within the FOIA definition of "agency records."  *Id.* at 9.  GAP therefore asserts that some documents *possessed* by the CIA might (1) qualify as "records" responsive to GAP's FOIA request, (2) without necessarily revealing the CIA's "mission."  Dkt. 80-1 at 4 (Blaine Decl. ¶ 6).

This argument, although theoretically plausible, is not supported by the facts of this case. As noted above, Blaine attests in categorical terms (1) that she engaged in "careful review;" (2) that she concurs with Shiner's determination that "the fact of the existence or non-existence of" the records that GAP seeks "is currently and properly classified;" and (3) that in her "considered

---

[5] Whether an agency has "sufficient 'control' over a document to make it an 'agency record'"— and thus subject to FOIA's disclosure rules in the first place—depends in part on "the extent to which agency personnel have read or relied upon the document" and "the degree to which the document was integrated into the agency's record system or files."  *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013) (quoting *Tax Analysts v. U.S. Dep't of Just.*, 845 F.2d 1060, 1069 (D.C. Cir. 1988), *aff'd* 492 U.S. 136 (1989)).  Thus, even if the CIA temporarily "possessed" some documents that it had not reviewed and integrated into its records, it is not at all clear that those records would be subject to this litigation in the first place, especially because Title 36 of the Code of Federal Regulations provides that "[n]onrecord materials" (*i.e.* those that do not meet the FRA's definition of "record") "must be physically segregated from records," 36 C.F.R. § 1222.16(b)(2), and "should be purged when no longer needed for reference," *id.* § 1222.16(b)(3)

judgment, . . . that conclusion would not change if it were determined that any responsive records—should they exist—had been derived from unsolicited information." Dkt. 80-1 at 5 (Blaine Decl. ¶ 8). Blaine further attests that, "[r]egardless of whether an Agency record [was] derived from solicited or unsolicited information, the record's mere existence or non-existence tends to reveal whether the CIA has a mission-related interest in, or connection to, the record's subject." *Id.* at 4 (Blaine Decl. ¶ 7).

Understood in this light, the Court is persuaded that the CIA cannot say more without revealing classified information. Indeed, even if the Court were to *assume* that GAP is correct and that the Agency *might* possess unsolicited documents relating to nuclear cooperation with countries in the Middle East, and even *if* those documents do not constitute agency records for purpose of the FRA, the CIA's hands would still be tied. Responding to GAP's FOIA request by disclosing the existence of unsolicited documents that the Agency declined to treat as agency records for purposes of the FRA would nonetheless reveal classified information about the CIA's assessment of what is, and what is not, relevant to its mission in an extraordinarily sensitive field that implicates fundamental issues of national security.

Finally, GAP argues that, even taking the CIA's assertions about their record-preservation process as true, "a document's connection in some way to some aspect of an agency . . . reveals nothing about its substance," Dkt. 84-1 at 10, and thus does not constitute evidence that "disclosing the withheld documents" would cause "a cognizable harm to national security," *id.* at 11. As a corollary, GAP asserts that the CIA's argument would simply sweep too broadly: "[I]f accepted, it would render the entirety of the agency's documents exempt from disclosure under the FOIA." *Id.* at 8; *see also id.* at 11.

The asserted connection between the CIA's records and the agency's mission-related interests must be read, however, in context of the specific FOIA request at issue.  The CIA nowhere argues that all of its "records" are classified and implicate national security, simply because they "tend[] to reveal whether the CIA has a mission-related interest in, or connection to, the record's subject."  Dkt. 80-1 at 4 (Blaine Decl. ¶ 7).  The concern is, rather, that revealing whether the CIA maintains any unsolicited communications that are responsive to this particular FOIA request would tend to reveal whether the CIA has an interest in the nuclear cooperation agreements and policy responses that are at issue in the instant request.  Exempting this subset of unsolicited communications that are responsive to GAP's FOIA request from disclosure would not, however, "render the *entirety* of the agency's documents exempt from disclosure under the FOIA."  Dkt. 84-1 at 8 (emphasis added).

GAP's argument that disclosing these unsolicited communications would not cause "a cognizable harm to national security," Dkt. 84-1 at 11, moreover, seeks to reopen the settled question of whether revealing that the CIA has (or does not have) a mission-related interest in the subject matter of GAP's FOIA request "could reasonably be expected to cause identifiable or describable damage to the national security."  Exec. Order 13526 § 1.4.  To be sure, the Blaine Declaration did not explicitly reassert the connection between the subject matter of GAP's FOIA request and the possible national-security-related harms that would flow from a non-*Glomar* response.  But it is sufficient for present purposes that Blaine (1) incorporated the Shiner Declaration, which articulated the national-security interests at stake in responding to GAP's FOIA request, Dkt. 80-1 at 3 (Blaine Decl. ¶ 4), and (2) explained that revealing the existence (or non-existence) of these unsolicited communications would suggest whether the CIA had a mission-related interest in the subject of the FOIA request, *id.* at 4–5 (Blaine Decl. ¶¶ 6–8)—a

14

revelation that this Court already deemed plausibly harmful to national-security interests, *GAP I*, 548 F. Supp. 3d at 153–54.   The question left unanswered in the CIA's initial summary judgment motion was not, in other words, the connection between the subject matter of GAP's FOIA request and national-security interests; it was merely whether "unsolicited communications from third parties" would actually "say [any]thing about the CIA's interests or activities." *Id.* at 158.  Because that exact question has since been answered by the Blaine Declaration, the Court now concludes that the CIA's *Glomar* response as to these unsolicited communications was proper under Exemption 1.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the CIA's renewed partial motion for summary judgment, Dkt. 79, is **GRANTED**; it is further **ORDERED** that GAP's renewed partial motion for summary judgment, Dkt. 84, is **DENIED**.

**SO ORDERED**.

 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 30, 2022

15